## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PERSONNA NOBLE;  C.T.H. PPA | : | |
| PERSONNA NOBLE;  K.H. PPA | : | |
| PERSONNA NOBLE; LUZ DEJESUS; | : | |
| R.J. III PPA LUZ DEJESUS; A.M.D. PPA | : | |
| LUZ DEJESUS; YOMALY RIVERA; Y.S. | : | |
| PPA YOMALY RIVERA; J.S. PPA | : | |
| YOMALY RIVERA; J.S. JR PPA | : | |
| YOMALY RIVERA; T.P. PPA | : | |
| YOMALY RIVERA; Y.S. PPA | : | |
| YOMALY RIVERA; ROSA | : | |
| RODRIGUEZ; FRANCISCO | : | |
| MONTANEZ; T.B. PPA ROSA | : | |
| RODRIGUEZ; C.B. PPA ROSA | : | |
| RODRIGUEZ; CHRISTINA FOSTER; | : | |
| A.F. PPA CHRISTINA FOSTER; K.T. | : | |
| PPA CHRISTINA FOSTER; AND K.T. | : | |
| PPA CHRISTINA FOSTER, as | : | |
| individuals and on behalf of all others | : | |
| similarly situated, | : | |
| *Plaintiffs* | : | Civil Action No: _____ |
| | : | |
| v. | : | |
| NORTHLAND INVESTMENT | : | |
| CORPORATION; LAWRENCE R. | : | |
| GOTTESDIENER; CHURCH STREET | : | |
| NEW HAVEN, LLC; NORTHLAND | : | |
| FUND II, LP; AND NORTHLAND | : | |
| FUND II PARTNERS, LLC | : | |
| *Defendants* | : | October 20, 2016 |

## CLASS ACTION COMPLAINT

1. Named Plaintiffs bring this action on behalf of themselves and all others similarly situated

   to remedy injuries caused by the defendants' practices in connection with ownership and

   management of the Church Street South housing complex in New Haven.  Named Plaintiffs

   and the members of the class (collectively "residents") have lived at Church Street South

within the past three years, although many have been displaced on account of the unlivable condition of their apartments.

2. This action is brought pursuant to the statutes and laws of the State of Connecticut. Jurisdiction is conferred by Title 28 United States Code § 1332. Named Plaintiffs and members of the proposed class are citizens of Connecticut and Defendants are citizens of other States. The amount in controversy exceeds the sum or value of $75,000, not including costs or interest.

3. Church Street South is an apartment complex of 301 apartment units on a 13-acre parcel located at the intersection of Church Street, Union Avenue, and South Orange Street in New Haven, across the street from Union Station. It is intended to provide housing for approximately 1,000 low-income adults and children, and it has been one of few places in New Haven for low-income families to live because New Haven and its surroundings have a shortage of decent, safe, and sanitary housing for poor families.

4. Defendant Northland Investment Corporation ("Northland") is a real estate development company that manages over $3 billion in real estate properties in New England, Texas, and the southern United States.  Northland is a Massachusetts stock corporation with its principal place of business located at 2150 Washington Street, Newton, Massachusetts.

5. Defendant Lawrence R. Gottesdiener is Northland's Chief Executive and Chairman and participated in the conduct described in this complaint, including decisions concerning the acquisition of Church Street South, maintenance at Church Street South, and the relocation of residents from Church Street South.

6. Northland holds itself out as a company that identifies "deeply discounted acquisition opportunities," acquires those properties "at below replacement cost," and manages every

aspect of development, "[f]rom contract negotiation to ribbon cutting and every step in between."

7. In addition to Northland and Gottesdiener, the defendants are the following entities:

   a) Defendant Church Street New Haven LLC ("Defendant LLC") is a single-member, single-asset Delaware Limited Liability Company with its principal place of business located at 2150 Washington Street, Newton, Massachusetts. Defendant LLC's sole member is Northland Fund II LP.

   b) Defendant Northland Fund II LP ("Defendant Partnership") is a Delaware limited partnership with its principal place of business located at 2150 Washington Street, Newton, Massachusetts. Defendant Partnership's General Partner is Northland Fund II Partners, LLC.

   c) Defendant Northland Fund II Partners, LLC ("Defendant General Partner") is a Delaware Limited Liability Company with its principal place of business located at 2150 Washington Street, Newton, Massachusetts. Defendant General Partner's sole member is Northland.

   d) Defendant LLC, Defendant Partnership, and Defendant General Partner (collectively "the shell defendants") are under the common ownership and pervasive control of Northland.

8. Upon information and belief, Northland disregards corporate formalities and intermingles the business activities of Northland and the shell defendants.

9. Northland, using each of the shell defendants as an alter ego and/or instrumentality, acquired Church Street South in 2008 for $3,975,000. Northland, through its control of Defendant General Partner, used Defendant Partnership to create Defendant LLC for the sole purpose

of acquiring, operating, and leasing Church Street South as Northland's alter ego. Defendant LLC is a single asset entity that holds the title to Church Street South, but at all times after acquisition, Northland was in control and had possession of the complex.

10. Along with the property, Defendants acquired the right to collect subsidized rent for Church Street South's exclusively low-income tenants.

11. Upon information and belief, in addition to rents paid by tenants, since the acquisition of Church Street South, Defendants have received approximately $3,000,000 each year in rent subsidies.

12. Upon acquisition and at all times thereafter, Defendants were on notice that in order to be decent, safe, and sanitary, Church Street South badly needed repairs to its structural elements, such as the building envelope, roofing, windows, plumbing, heating, ventilation, bathroom and kitchen fixtures, electrical systems, means of egress, and exhausts.

13. Instead of meeting their obligations as landlord and property manager, and despite their knowledge of the unsafe and deteriorating conditions at Church Street South, Defendants allowed conditions to deteriorate even further by choosing to spend much less than necessary on repairs and maintenance, with the plan of allowing the property to become uninhabitable beyond repair and then to raze it and build upscale housing in its place. Defendants' demolition-by-neglect plan included, among other things:

    a) only making repairs to the complex when ordered by city or federal officials responding to hazards that created imminent life-threatening danger;

    b) making plainly insufficient repairs, by hiring contractors who were in many cases incompetent, unlicensed, or both, or ordering or encouraging contractors to conceal

problems by patching holes, toxic mold stains, and other damage with paint, compound, or bleach, instead of addressing the root of the problem;

c) taking advantage of the limited resources of government health and housing regulators and inspectors by allowing problems to fester until officials were present on the property responding to tenants' concerns; and

d) taking advantage of the lack of options available to low-income families relying on Section 8 federal assistance within their properties. Defendants knew that these families would be deterred from complaining about substandard and illegal conditions at the complex because they had no other place to go if their apartments were condemned.

14. The dangerous conditions at Church Street South were not only obvious and well known to Defendants but were the subject of official notice on multiple occasions. Investigations between 2010 and 2013 included the following:

a) a July 2010 inspection by city inspectors that found code violations in 48 out of 120 apartments inspected;

b) a January 2011 carbon monoxide leak from a defectively installed furnace that sent five tenants to the hospital, displaced twenty-six residents from their homes, and resulted in orders from HUD and city inspectors to remediate conditions that were not decent, safe, and sanitary;

c) a January 2013 inspection conducted by HUD that found several life-threatening conditions and systemic deficiencies at the complex; and

d) inspections during 2013, conducted by the City of New Haven, which found that roofs on Church Street South buildings failed to meet standards for water-tightness, resulting in leaked water into tenants' apartments and infestations of toxic mold.

15. In 2015, as conditions at Church Street South continued to deteriorate, inspectors from the City of New Haven condemned more than a dozen apartments and found roof failures at nearly every building in the complex; work being done without permits; and unsafe means of egress at nearly every building in the complex, and ordered that Defendants relocate dozens of families from their homes.

16. In September 2015, HUD returned to the complex, finding over 1,000 health and safety deficiencies in the apartments inspected and giving the complex a grade of 20 out of 100 possible points.

17. After the first group of families were removed from their homes and housed for months in crowded hotel rooms, and the horrific conditions at Church Street South were widely publicized, Northland announced that the complex was "functionally obsolete" and that all tenants of the complex must be relocated. Allowing conditions to deteriorate to that point furthered Northland's plan to redevelop the complex for more profitable use.

18. Since Northland's announcement, apartments continue to be condemned, unsafe conditions at Church Street South continue to be discovered, and the hazardous conditions for tenants who remain at the complex continue to deteriorate as the complex empties out and apartments remain vacant and boarded up.

19. Named Plaintiffs and class members have either been relocated, typically to hotels, as a result of the uninhabitable conditions at their apartments or remain in their unsafe,

uninhabitable units out of fear that temporary accommodations will be no better for their family and no permanent home will be found.

## CLASS ACTION ALLEGATIONS

20. Pursuant to Rule 23, Fed. R. Civ. P., Named Plaintiffs bring this action on behalf of all persons who live at Church Street South or have lived there during all or part of the past three years ("the class period").

21. A class action is superior to other available methods for adjudication of this case. The class is so numerous that joinder of all members is impracticable: more than 1,000 people have lived at Church Street South during the class period. There are questions of fact and law common to all members of the class in that all class members have resided in premises that are unfit for human habitation and dangerous to residents' health and safety due to Defendants' pervasive failure to meet their legal obligations and the resulting damage to persons and property. Named Plaintiffs' claims, described in paragraph 23 below, are typical of the claims of the class; questions of law and fact common to the members of the class predominate over any questions affecting only individual members.

22. Named Plaintiffs will fairly and adequately protect the interests of the other class members if designated as class representatives by the court. The interests of Named Plaintiffs are coincident with and not antagonistic to the interests of the class, and Named Plaintiffs have retained competent counsel with extensive relevant experience. Additionally, numerous class members have retained the proposed class counsel to represent them in this action; these class members are identified in paragraph 25 below.

23. Named Plaintiffs and their circumstances are as follows. The adult plaintiffs bring this case

on their own behalf and on behalf of their minor children:

    a)  Plaintiff Personna Noble and her children, C.T.H., age 9 and K.H., age 4, moved into

        14C Christopher Green in 2013. From the time Plaintiffs moved into the apartment

        and continuously thereafter the apartment was defective, dangerous, and hazardous to

        their health. Conditions included water leakage, broken windows, broken bathroom

        and kitchen fixtures, inadequate ventilation, a broken door, and a faulty electrical

        system, causing flooding, moisture incursion, hazardous air quality, and infestations

        of toxigenic mold species, bacteria, fungi, and dust mites. Defendants made repairs

        late and inadequately or not at all. Because of the unlivable conditions at the

        apartment, in August 2015 Plaintiffs were told to leave their apartment by an

        employee of Defendant LLC. The family was moved to the Premier hotel in New

        Haven for one month, then moved to the Clarion hotel in Hamden for a month, and

        then to the Quality Inn in East Haven for another month, before moving to an

        apartment in December 2015. At each of the hotels, Plaintiff Noble and her two

        young children were confined to one room with two beds and one bathroom and no

        cooking facilities, except for a small kitchenette at the Premier hotel.

    b)  Plaintiff Luz DeJesus and her children, R.D. III, age 17 and A.M.D., age 14, lived at

        9C Jose Marti Court in Church Street South for fourteen years. From the time

        Plaintiffs moved into the apartment and continuously thereafter the apartment was

        defective, dangerous, and hazardous to their health, and it deteriorated further after

        Defendants acquired the property. Conditions included persistent water leakage into

        the walls and ceilings of the apartment, faulty plumbing, a broken boiler, and

damaged windows, causing flooding, moisture incursion, hazardous air quality, and
infestations of toxigenic mold species, bacteria, fungi, and dust mites. Defendants
made repairs late and inadequately or not at all. Because of the unlivable conditions at
the apartment, in September 2015 Plaintiffs were told to leave their apartment by an
employee of Defendant LLC. The family had to live in hotels for more than a year,
first for a brief time at the Clarion Inn in Hamden and for the remainder at the
Premier hotel in New Haven. While at the Clarion Inn, Plaintiff DeJesus was
confined to one room with her two minor children before getting moved to a small
suite with a separate sleeping area for her son R.D. III. At the Premier hotel, where
Plaintiff DeJesus lived for almost a year, she lived with her two children in a small
suite with two bedrooms and a small living area. Plaintiff DeJesus and her children
finally moved to a new apartment in West Haven in September 2016.

c) Plaintiff Yomaly Rivera and her minor children, Plaintiffs Y.S., age 14, J.S., age 10,
   J.S., Jr., age 10, T.P., age 5, and Y.S., age 3 (Yomaly's nephew, for whom she
   assumed custody), moved to 97A Columbus Avenue in Church Street South in 2013.
   From the time Plaintiffs moved into the apartment and continuously thereafter the
   apartment was defective, dangerous, and hazardous to their health. Conditions
   included damaged, leaking walls and ceilings, a broken radiator, broken and
   dangerous electrical outlets, holes in the walls and ceilings, broken doors, and broken
   bathroom and kitchen fixtures, causing flooding, moisture incursion, soggy and damp
   walls, hazardous air quality, and infestations of toxigenic mold species, bacteria,
   fungi, and dust mites. Defendants made repairs late and inadequately or not at all.
   Because of the unlivable conditions at the apartment, in August 2015 Plaintiffs were

told to leave their apartment by an employee of Defendant LLC. The family was moved to the Clarion Inn in Hamden for one night before being moved again to the Premier hotel in New Haven, where they stayed for three months. In both hotels, Plaintiff Rivera and her five children were confined to single rooms with two beds. Plaintiff Rivera and her children finally moved to a new apartment in November 2015.

d)  Plaintiff Rosa Rodriguez, her adult son Plaintiff Francisco Montanez, and her minor children Plaintiffs T.B., age 16, and C.B., age 14, moved to 80A South Orange Street in Church Street South in October 2011.  From the time Plaintiffs moved into the apartment and continuously thereafter the apartment was defective, dangerous, and hazardous to their health. Conditions included a leaking boiler, defective air ventilation systems, cracking and peeling paint, broken bathroom and kitchen fixtures, crumbling walls and floors with holes in them, and broken windows, causing flooding, moisture incursion, hazardous air quality, and infestations of toxigenic mold species, bacteria, fungi, and dust mites. Defendants made repairs late and inadequately or not at all. Because of the unlivable conditions at the apartment, in August 2015 Plaintiffs were told to leave their apartment by an employee of Defendant LLC. The family was moved to the Premier hotel in New Haven for one month before being moved again to the Clarion Inn in Hamden, where they stayed two and a half months. In both hotels, Plaintiff Rodriguez, her adult son, and her minor children were confined to a single room with two beds. At the Premier hotel, the family had access to a small kitchenette, but at the Clarion Inn, the family had no access to cooking facilities for Plaintiff Rodriguez or the children.

e) Plaintiff Christina Foster and her minor children, Plaintiffs A.F., age 14, K.T., age 8, and K.T., age 4, moved to 4A Cinque Green in Church Street South in June 2013. From the time Plaintiffs moved into the apartment and continuously thereafter the apartment was defective, dangerous, and hazardous to their health. Conditions included leaks, cracks, and holes in the ceilings and walls, a broken boiler, broken bathroom and kitchen fixtures, defective air ventilation systems, and cracking and peeling paint, causing flooding, moisture incursion, hazardous air quality, and infestations of toxigenic mold species, bacteria, fungi, and dust mites. Defendants made repairs late and inadequately or not at all. Because of the unlivable conditions at the apartment, in October 2015 Plaintiffs were told to leave their apartment by an employee of Defendant LLC. The family was moved to the Clarion Inn in Hamden where they lived for over four months until they were relocated again to the Premier hotel in New Haven, where they lived for a few weeks before moving into their current apartment. In both hotels, Plaintiff Foster and her minor children were confined to a single room with two beds. At the Premier hotel, the family had access to a small kitchenette and living area, but at the Clarion Inn, where they stayed for over four months, the family had no access to cooking facilities for Plaintiff Foster or the children.

24. The injuries and damages suffered by Named Plaintiffs and the members of the class include but are not limited to the following:

a) physical injuries from the effects of living in an apartment polluted by fungi, mold, dust, mildew, dust mites, and bacterial exposure and from then living in hotels without the basic requirements of decent housing;

b) emotional distress from living in unsafe and unlivable conditions in their apartment; living in a single hotel room instead of a decent, safe, and sanitary apartment; physical symptoms as well as anxiety about continuing health consequences; the interruption and impairment of the activities of daily life; losing household possessions to moisture, mold, and water damage; and in the case of parents, witnessing and being unable to prevent their children's injuries and damages and in the case of the children witnessing their mother's injuries and damages;

c) loss of the family's household belongings to mold and water damage, as well as from theft on account of Defendants' failure to ensure security at the complex by, for example, failing to promptly repair broken windows;

d) costs of medical care and treatment, both past and future, for illnesses and for medical monitoring;

e) inconvenience, discomfort, and hardship resulting from Defendants' interference and impairment of residents' possessory interest in their apartments, including the discomfort of being cramped into living arrangements with fewer bedrooms, smaller spaces, and inadequate facilities for cooking, laundry, and other life activities; the inconvenience and hardship for both adults and minor children of being relocated further away from work, school, and shopping; and the inconvenience and hardship of being forced to find new living arrangements as low-income renters in a city and region with a dearth of affordable housing options;

f) educational losses for the minor residents; and

g) financial losses from lost time from work and loss of future earning capacity.

25. Class members who have retained the proposed class counsel include the following:

a)      Sherelle Allen, on her own behalf and on behalf of her two minor children, ages 8 and 1.

b)      Latoya Arnold, on her own behalf and on behalf of her three minor children, ages 13, 9, and 5.

c)      Ramonita Arroyo, on her own behalf and on behalf of her minor child, age 17.

d)      Wanda Arroyo.

e)      Pablo Batista.

f)      Roxanne Bleau, on her own behalf and on behalf of her four minor children, ages 12, 7, 5, and 1.

g)      Courtney Boyd, on her own behalf and on behalf of her two minor children, both age 7.

h)      Margaret Brodie, on her own behalf and on behalf of her minor grandchild, over whom she has custody, age 10.

i)      Denitrus Brown, on her own behalf and on behalf of her minor child, age 13.

j)      Desiree Brown, on her own behalf and on behalf of her three minor children, ages 17, 9, and 6.

k)      Tashawn Brown, on her own behalf and on behalf of her five minor children, ages 14, 12, 7, 5, and 3.

l)      Bettie Byrd.

m)      Ruchelleen Canales, on her own behalf and on behalf of her five minor children, ages 13, 10, 8, 7, and 5.

n)      Tahis Caraballo, on her own behalf and on behalf of her six minor children, ages 13, 11, 7, 5, 3, and 1.

o)     Ada Cedeno, on her own behalf and on behalf of her two minor children, ages 15 and 14.

p)     Emily Cepeda, on her own behalf and on behalf of her two minor children, ages 9 and 6.

q)     Anna Colvin.

r)     Monica Colvin, on her own behalf and on behalf of her minor child, age 8.

s)     Rose Concepcion, on her own behalf and on behalf of her two minor children, ages 15 and 4.

t)     Taishi Covington, on her own behalf and on behalf of her two minor children ages 8, and 1.

u)     Stephanie Cruz, on her own behalf and on behalf of her two minor children, ages 10 and 8.

v)     Carmen Damiani-Lugo.

w)     Yasmarie Damiani, on her own behalf and on behalf of her minor child, less than 1 year old.

x)     Yaritza Camacho on her own behalf and on behalf of her minor child, age 1.

y)     Laynette Del Hoyo, on her own behalf and on behalf of her two minor children ages 8, and 1.

z)     Haydee Diaz.

aa)     Naomi Fernandez, on her own behalf and on behalf of her minor children, ages 13, 14, and 1.

bb)     Iris Figueroa, on her own behalf and on behalf of her two minor children, both age 17.

14

cc)     Shakira Grajales, on her own behalf and on behalf of her minor child, Kaiden
        Loaiza, age 1.

dd)     Carmen Gonzalez.

ee)     Symon Nuñez.

ff)     Karyann Gonzalez, on her own behalf and on behalf of her four minor children,
        ages 17, 14, 11, and 8.

gg)     Natalie Gonzalez, on her own behalf and on behalf of her four minor children, ages
        15, 13, 10, and 8.

hh)     Melissa Guffey, on her own behalf and on behalf of her four minor children, ages
        10, 4, 3, and 1.

ii)     Calixmarie Guzman, on her own behalf and on behalf of her two minor children,
        ages 2 and 6.

jj)     Shaquana Henry, on her own behalf and on behalf of her minor child, age 9.

kk)     Milly James, on her own behalf and on behalf of her three minor children, ages 11,
        4, and 7.

ll)     Sharmaine Kinsey, on her own behalf and on behalf of her minor child, age 9.

mm)     Carolyn Kornegay.

nn)     Juanita LeBron.

oo)     Clara London.

pp)     Shavon London.

qq)     Shirley London, on her own behalf and on behalf of her three minor children, ages
        11, 5, and 3.

rr)     Jajaira Lopez, on her own behalf and on behalf of her four minor children, ages 13, 10, 10, and 9.

ss)     Nancy Lopez.

tt)     Denisha Cirino.

uu)     Davielyz Diaz.

vv)     Erika Lorenzana, on her own behalf and on behalf of her minor child, age 13.

ww)     Anthony Marrero.

xx)     Olga Luna.

yy)     Carmen Maldonado, on her own behalf and on behalf of her two minor children, ages 13 and 12.

zz)     Gabriel Ramirez.

aaa)     Ashley Ramirez.

bbb)     Carmen Marcano, on her own behalf and on behalf of her three minor children, ages 14, 9, and 4.

ccc)     Maria Marin, on her own behalf and on behalf of her two minor children, ages 14 and 9.

ddd)     Jacqueline Marrero, on her own behalf and on behalf of her minor child, age 17.

eee)     Jashiramilett Matos, on her own behalf and on behalf of her three minor children, ages 12, 10, and 1.

fff)     Maria Medina on her own behalf and on behalf of her two minor children, ages 11 and 5.

ggg)     Wanda Mercado.

hhh)     Daeshalinn Sandoval.

iii)      Natasha Sandoval, on her own behalf and on behalf of her three minor children, ages 4, 2, and 2.

jjj)      Sheree Murphy, on her own behalf and on behalf of her minor child Carnaiya Curtis, age 15.

kkk)      Emilia Nunez, on her own behalf and on behalf of her minor child Cesarluis Lopez, age 6.

lll)      Zuleika Osorio, on her own behalf and on behalf of her minor child, age 17.

mmm)      Jovannie Laureano.

nnn)      Marielis Pagan, on her own behalf and on behalf of her three minor children, ages 11, 10 and 6.

ooo)      Lateisha Parker, on her own behalf and on behalf of her two minor children, ages 9 and 8.

ppp)      Shacola Parker, on her own behalf and on behalf of her two minor children, ages 12 and 8.

qqq)      Elias Perez.

rrr)      Jessica Collet Quiles, on her own behalf and on behalf of her three minor children, ages 16, 14, and  12.

sss)      Zamira Quilez, on her own behalf and on behalf of her three minor children,  ages 16, 9, and  6.

ttt)      Ruth Quinones.

uuu)      Llesenia Rivera, on her own behalf and on behalf of her two minor children ages 16, and 13.

vvv)  Blanca Rodriguez, on her own behalf and on behalf of her minor grandchild over whom she has full custody, age 16.

www)  Deborah Rodriguez.

xxx)  Michael Soto.

yyy)  Yadira Rodriguez, on her own behalf and on behalf of her five minor children,  ages 13, 12, 9, 6, and  6.

zzz)  Ivelisse Sanchez, on her own behalf and on behalf of her seven minor children, ages 14, 12, 11, 9, 6, 2, and 1.

aaaa)  Liz Soto Santiago, on her own behalf and on behalf of her minor child, age 4.

bbbb)  Tina Santiago, on her own behalf and on behalf of her minor children, ages 13, 9, 4, and 1.

cccc)  Yolanda Santiago.

dddd)  Leeza Skovinski, on her own behalf and on behalf of her minor child, age 1.

eeee)  Perniecia Smith, on her own behalf and on behalf of her minor child, age 5.

ffff)  Jacqueline Soto, on her own behalf and on behalf of her minor children, ages 3 and 10.

gggg)  Magda Soto, on her own behalf and on behalf of her minor children, ages 11, 9, and 6.

hhhh)  Courtney Taylor, on her own behalf and on behalf of her minor children, ages 14 and 10.

iiii)  Diane Turner, on her own behalf and on behalf of her minor child, age 11.

jjjj)  Stacy Viera, on her own behalf and on behalf of her three minor children, ages 16, 9, and 8.

kkkk)   Omayra Villanueva, on her own behalf and on behalf of her two minor children ages 6 and less than 1.

llll)   Bernice Weinstein, on her own behalf and on behalf of her three minor grandchildren,   ages 2, 5, and 6.

## FIRST CLAIM: NEGLIGENCE

1-25. Paragraphs 1-25 above are incorporated by reference the same as if fully set forth herein.

26. Since 2008, Defendants have had possession and control of Church Street South, including, among other things, its roofs, walls, structural supports, plumbing and hot water facilities, ventilation systems, and common areas.

27. Throughout this time, Church Street South has had defective, dangerous, and toxic conditions, including but not limited to the following:

    a.   leaks, cracks, and holes in walls, floors, ceilings, and foundations, which have caused serious microbial problems, including mold colonization and other hazardous conditions as further described in this complaint;

    b.   leaks in the water pipes;

    c.   leaks, cracks, and holes in the roofs;

    d.   contamination with toxigenic mold species, bacteria, dust mites, roaches, rodents, and fungi;

    e.   moisture incursion due to leaks in roofs, water pipes, walls, ceilings, and floors of all the buildings, creating and exacerbating the growth of airborne bacteria, fungal mold spores, roach and rodent infestations, and dust mites;

    f.   inadequate outdoor air ventilation and a shortage of fresh air, which contributed to the growth of mold and other chemical and biological contaminants;

    g.   lack of adequate humidity control, which has exacerbated the mold growth problems; and

    h.   recurrent flooding from bathroom and kitchen fixtures, through doors and windows, and through leaks in water pipes, ceilings, and walls, particularly during storms, causing further water damage to apartments, mold growth, and water damage to residents' belongings.

28. Defendants were put on notice and in fact have been well aware of these conditions for a long time.

29. Defendants were put on notice and in fact were well aware that the physical condition of the complex was defective, dangerous, and hazardous to the health of its inhabitants.  The dangerous and deteriorated condition of the buildings and apartments was obvious to Defendants and was made even more so by the following:

    a.   defendants received many complaints regarding water infiltration and related health concerns from residents;

    b.   the leaks in the roofs, walls, ceilings, floors, and water pipes of the complex were obvious at the time of acquisition;

    c.   it was inevitable that the large amount of water infiltration throughout the complex would bring widespread mold;

    d.   the roofs and walls of all the buildings were constantly in need of emergency repairs; and

     e.  numerous health and safety inspections confirmed and documented the dangerous conditions.

30. The injuries, illnesses, and damages of Named Plaintiffs and the members of the class were caused by Defendants' negligence and carelessness in one or more of the following ways:

     a.  they permitted the existence and growth of the mold, fungi, bacteria, dust mites, and other airborne contaminants and the other health hazards identified above;

     b.  they failed to eliminate or remediate the water and/or moisture incursion;

     c.  they failed to inspect, or made inadequate inspections, to identify violations of law and hazards to health and safety, despite notice;

     d.  they failed to inspect, or made inadequate inspections, of the areas of moisture incursion, despite notice of the environmental and health hazards caused by the water and moisture incursion;

     e.  they failed to conduct the necessary testing to determine the presence of mold, mildew, bacteria, fungi, dust mites and/or other hazardous substances within the apartments;

     f.  they failed to repair or fix the roofs, and negligently executed what repairs they did perform, allowing water and moisture incursion and flooding;

     g.  they failed to repair or fix the water pipes and negligently executed what repairs they did perform, allowing water and moisture incursion and flooding;

     h.  they failed to repair or fix the walls, ceilings, floors, and other structural elements, including but not limited to the building envelope, windows, window frames, bathroom exhaust systems, and other systems, and negligently executed what repairs they did perform, allowing water and moisture incursion and flooding;

i.  they participated in the creation of a nuisance by allowing the growth of mold, fungi, bacteria, and dust mites to occur and the other health hazards identified above to exist;

j.  they failed to take steps to remediate the growth of fungi, mold, bacteria, and infestation of rodents, cockroaches, and dust mites, when they knew or should have known that the failure to do so would expose the residents to injuries such as those described in this Complaint;

k.  they failed to warn the residents of the environmental and health hazards identified above;

l.  they maintained the apartments in the hazardous conditions described above;

m.  they breached duties owed to the residents of Church Street South pursuant to Connecticut General Statutes § 47a-7, in the following ways:

   i.  they failed to comply with the statutory obligations set forth in Connecticut General Statutes § 47a-7 to maintain the premises in a fit and habitable condition;

   ii.  they failed to make all repairs and do what was necessary to put and keep the premises in a fit and habitable condition;

   iii.  they failed to keep all common areas of the premises in a clean and safe condition;

   iv.  they failed to maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating and other facilities and appliances, that they were required to supply; and

22

       v.  they failed to remedy the mold contamination as required by Connecticut General Statutes § 47a-12(a).

n.  they breached duties owed to the residents of Church Street South pursuant to the New Haven Housing Code, in the following ways:

       i.  they failed to comply with the  obligations set forth in New Haven Housing Code Paragraph 300(b) to ensure that every unit on the premises has a complete bathroom fixture group in sound working condition and in good repair;

      ii.  they failed to comply with the obligations set forth in New Haven Housing Code Paragraph 300(e) to ensure that every unit on the premises has water heating facilities that are properly installed and maintained in safe and in good working condition;

     iii.  they failed to comply with the obligations set forth in New Haven Housing Code Paragraph 301(b) to ensure that every habitable room on the premises has at least one working window or skylight that can be easily opened or another device to adequately ventilate each room;

     iv.  they failed to comply with the obligations set forth in New Haven Housing Code Paragraph 301(e) to ensure that every unit on the premises has a heating system that is properly installed, maintained in safe and good working condition, and capable of providing adequate heat to all rooms and bathrooms within the unit;

      v.  they failed to comply with the obligations set forth in New Haven Housing Code Paragraph 302(a) to ensure that roofs on the premises are reasonably

23

weather-tight, water-tight, rodent- and insect-proof, in sound working condition, and in good repair;

vi.  they failed to comply with the obligations set forth in New Haven Housing Code Paragraph 302(b) to ensure that windows are reasonably weather-tight, water-tight, rodent proof, in sound working condition, and in good repair;

vii.  they failed to comply with the obligations set forth in New Haven Housing Code Paragraph 302(c) to maintain stairs and porches on the premises in sound condition and good repair;

viii.  they failed to comply with the obligations set forth in New Haven Housing Code Paragraph 302(d) to ensure that plumbing fixtures, water, and waste pipes are properly installed and maintained in good sanitary working condition, free from defects, leaks, and obstructions;

ix.  they failed to comply with the obligations set forth in New Haven Housing Code Paragraph 302(e) to ensure that floors in kitchens and bathrooms on the premises are constructed and maintained so as to be reasonably impervious to water and to permit such floor to be easily kept in a clean and sanitary condition;

x.  they failed to comply with the obligations set forth in New Haven Housing Code Paragraph 302(h) to ensure that walls, ceilings, interior woodwork, doors, and windows are kept free of flaking, peeling, and loose paint, and to properly resurface or repaint such surfaces as needed; and

xi.  they failed to implement effective prevention methods to thwart mold growth.

31. As a result of Defendants' conduct described above, residents experienced the harmful effects of fungi, mold, dust, dust mites, mildew, and bacteria exposure, and poor indoor air quality. The full extent of these injuries is not yet known, but they include the following medical conditions, among others, which can be permanent and can accelerate over time: allergic rhinitis; sinusitis; respiratory problems secondary to mold exposure; chronic swollen neck glands with tenderness; muscle spasms; headaches; sore throats; nasal congestion; nausea; loss of appetite; dizziness; lethargy; fatigue; difficulty concentrating and cognitive impairment; hives; skin rashes and exacerbated eczema; hypersensitivity to allergens; lowered immunity; dysphoria; physical pain; difficulty swallowing and digesting food; nose bleeds; triggered or exacerbated preexisting sensitivities to mold, fungi, dust mites, and bacteria and other allergens; anxiety and emotional distress; and the side effects of medications made necessary by these conditions.

32.  Residents' injuries, which are painful and disabling, have impaired their ability to engage in the activities of life and will continue to do so in the future.

33. As a further result of Defendants' conduct, residents have been or are being displaced from their homes, sometimes on short notice, causing distress, disruption, inconvenience, and expense, as well as the hardship of living as a family in a single hotel room for weeks or months at a time. These hardships include being cramped into smaller living spaces, with fewer bedrooms, forcing family members to share bedrooms and even beds, which has caused difficulty sleeping, stress, and discomfort; being forced to live in apartments without cooking facilities, interrupting families' ability to prepare meals and provide for their

children's nutritional needs; losing access to facilities for cleaning laundry; losing the privacy that comes with living in one's own home as opposed to living in a hotel for months or even, in some cases, more than a year; being relocated to living arrangements farther from work, school, and shopping, causing inconvenience and hardship; and other discomfort and hardship.

34. As a further result of Defendants' conduct, residents have required medical treatment and in some cases hospitalization and have incurred expenses for necessary care and treatment; and residents will require further care and treatment and incur further expenses in the future.

35. As a further result of Defendants' conduct, residents have incurred, and continue to incur economic losses, including, but not limited to travel expenses, loss time from work, and loss of household belongings.

36. As a further result of Defendants' conduct, many residents have been and may continue to be forced to discard items of personal property that had become contaminated and permanently damaged by the water, moisture incursion, rodent and/or insect infestation, and mold contamination within their apartments. In other cases, Defendants have simply thrown away residents' belongings without regard to whether they are salvageable. For many of the residents of Church Street South, the belongings lost due to the negligent actions of Defendants made up most of their personal possessions.

37. As a further result of Defendants' conduct, minor residents have lost time from school and were unable to attend school as they did before and concentrate on school work.

38. As a further result of Defendants' conduct, residents have lost time from work, and their earning capacity has been reduced.

39. As a further result of Defendants' conduct, residents have suffered  increased risk of
contracting serious latent diseases resulting from exposure to the hazardous conditions at
their apartments, including asthma, other respiratory ailments, cancer, and reproductive
disorders, so that ongoing medical monitoring is required.

### SECOND CLAIM: RECKLESSNESS

1-39. Paragraphs 1-39 of the First Claim are hereby incorporated by reference as paragraphs 1-39
of this Second Claim.

40. The injuries and losses to residents were caused by the recklessness of Defendants in that
they were aware of the conditions described in this complaint; were aware of their legal
obligation to correct the conditions; were aware of the dangers to health, safety and personal
property that the continuation of these conditions created; and were aware of the distress
that is caused by being displaced from one's home, and yet they chose not to correct the
conditions.  Their choice was motivated in whole or in part by their desire to empty the
project and tear it down in order to replace it with a more profitable use.

41. Plaintiffs and the members of the class are entitled to punitive damages because Defendants'
conduct was the product of their reckless indifference to the rights and well-being of
Church Street South residents.

### THIRD CLAIM: UNFAIR TRADE PRACTICES

1-41. Paragraphs 1-41 of the Second Claim are hereby incorporated by reference as paragraphs
1-41 of this Third Claim.

42. Defendants, through their conduct, are engaged in trade or commerce within the meaning of
the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a *et. seq*. (CUTPA).

27

43. By engaging in the conduct described above, which caused the injuries and losses described above, Defendants committed unfair and deceptive acts or practices in the conduct of trade or commerce in violation of CUTPA.

44. These acts and omissions were unfair, immoral, unethical, oppressive and unscrupulous, and have caused substantial injury to consumers, including Named Plaintiffs and other members of the proposed class.

45. In addition, Defendants' conduct was immoral, unethical, oppressive, unscrupulous, and deceptive in that:

   a) Defendants' conduct was a plan of "demolition by neglect," allowing conditions to deteriorate to a point where tenants would be forced to move out. Defendants knew that each tenant relocated from Church Street South would be another tenant unlikely to desire a place in a future development of the property and that its neglect of Church Street South made the eventual condemnation of apartments inevitable, but they refused to address the hazardous conditions, instead spending as little money as they could repairing the structural elements of Church Street South;

   b) In accordance with this plan, Defendants conducted insufficient repairs, hired unlicensed and incompetent contractors, patched over serious issues without resolving root causes, allowed toxic mold infestations to amplify, and refused to undertake structural repairs that could remedy tenants' complaints;

   c) Defendants made false and misleading statements of material fact, and concealed and omitted material facts, regarding apartments of Church Street South, by:

(1) sending teams of maintenance workers to patch and paint severe toxic mold infestations and conceal major structural issues when showing apartments to prospective tenants;

(2) maintaining and repairing the apartments that they showed to inspectors, in order to avoid legal liability without addressing tenants' issues and concerns;

(3) falsely representing to tenants that issues within their apartments would be fixed when they had no plans to undertake the repairs necessary to resolve these problems; and

(4) falsely representing to city and federal inspectors that serious structural issues would be addressed.

d) Defendants exploited the class because they had knowledge that many residents received rent subsidies that were not transferable to apartments outside of the complex. Because members of the class had no choice as a practical matter but to stay within their apartments, Defendants were able to make repairs slowly or simply ignore tenant complaints at the complex;

e) Defendants violated the public policy of the State of Connecticut and City of New Haven by continuing to enter leases and collect rent for apartments that were unsafe, unsanitary, and indecent, and in violation of local and state building, health, and safety codes; and

f) Defendants continued to collect rent with the knowledge that the rent was being collected for apartments that were and are uninhabitable and unsafe in violation of the Connecticut General Statutes and New Haven Housing Code.

46. As a result of the unfair and deceptive conduct of defendants, Named Plaintiffs and members of the class have suffered ascertainable losses within the meaning of Connecticut General Statutes § 42-110g(a).

47. Named Plaintiffs and members of the class have suffered injury in fact, as described in the paragraphs above.

48. Named Plaintiffs and members of the class are entitled to compensatory damages from Defendants for their economic and non-economic damages.

49. Named Plaintiffs and the members of the class are entitled to punitive damages because Defendants' violations of CUTPA reveal a reckless indifference to the rights of Church Street South residents.

## FOURTH CLAIM: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

1-49. Paragraphs 1-49 of the Third Claim are hereby incorporated by reference as paragraphs 1-49 of this Fourth Claim.

50. Defendants knew or should have known that their conduct involved an unreasonable risk of causing emotional distress and that such distress, if it were caused, might result in illness or bodily injury.

51. Defendants' negligent and reckless conduct, described above, caused emotional distress to residents.

52. The distress suffered by residents was of such a nature that it has and might in the future result in illness or bodily harm.

53. The distress suffered by residents was foreseeable and reasonable in light of the conduct of Defendants.

30

54. Named Plaintiffs and the members of the class are entitled to compensatory damages as a result of Defendants' negligent conduct that resulted in emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and behalf of the proposed class, respectfully request:

A. An order certifying that the action may be maintained as a class action, certifying Named Plaintiffs as representatives of the proposed class, and appointing undersigned counsel as counsel for the proposed class, pursuant to F.R.C.P. 23, Conn. Gen. Stat. § 42-110g(b), 42-110h, or other applicable law;

B. Compensatory damages pursuant to Conn. Gen. Stat. §§ 42-110g(a) and common law;

C. Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a) and common law;

D. Reasonable attorney's fees and other costs of the action pursuant to Conn. Gen. Stat. §§42-110g and/or the common law; and

E. Such other and further relief as this Court deems just and proper.

## PLAINTIFFS DEMAND TRIAL BY JURY.

THE PLAINTIFFS

By _____

David N. Rosen ct 00196
Barbara Goren ct26728
Alexander Taubes ct30100
David Rosen & Associates, P.C.
400 Orange Street
New Haven, CT 06511
(203) 787-3513
(203) 787-1605 fax
drosen@davidrosenlaw.com
bgoren@davidrosenlaw.com
ataubes@davidrosenlaw.com